Bucci v. Commissioner of Internal Revenue Mr. Andreozzi, I see you reserve two minutes for rebuttal and you can begin whenever you're ready. Thank you, Your Honor. May it please the Court, I'm Randall Andreozzi and I represent Mr. and Mrs. Bucci, the appellants in the case. And what I wanted to do for the oral argument was to bring to the Court's attention, we tried to do this in a supplement, but that was denied, new intervening authority that will directly affect this case. And that is a specifically a November 5th, 2024 order that was issued by Judge Gokey of the U.S. Tax Court in a case called Schwarz v. Commissioner. And that was the earlier opinion on the case was TC Memo 2024-55. In that case, the taxpayer filed an untimely motion for consideration after the opinion was issued in light of Loper Bright v. Raimondo, the Supreme Court ruling. Judge Gokey entertained the untimely order and granted the motion for reconsideration stating specifically, Chevron was clearly implicit controlling law at the time the opinion was issued. And because Loper Bright overruled Chevron, reconsideration of the opinion, and then parenthetical, in which we extensively relied on TRES-REG 1.183-1D and 1.183-2D is appropriate. Your Honors, Judge Holmes in our case relied extensively on both of those regulations in deciding under the nine-factor test of the regulations. Are you suggesting to us that in light of that change in the Supreme Court on Chevron, that we're no longer authorized to read and apply TRES-REG regulations? No, not at all, Your Honor. What I'm saying is that the courts have the ability now to determine what deference they will give to those TRES-REG regulations. In some instances, for example, there's a case, LISAC, that came down after Chevron dealt with whistleblower regulations. Some cases, the regulations may allow... What are you asking us to do with the regulations that are at issue in this case? What I'm asking, Judge, is that this Court authorize remand of the case, because the Court in our case, Judge Holmes, in the tax court, did not apply the regulations appropriately. That's a question of law, isn't it? Yes, the application of the regulations. Why can't the three of us do that? You may be able to do that. The unfortunate thing here is that the record in the tax court case, because the individual was pro se, is lacking, and there are several other deficiencies in the record. You would agree, regardless of the factors in the regulations, that the primary purpose for the activity must be for profit. That's the bottom line, right? That is correct. Let's focus on that. In this record, you would agree it has to be with the objective of making a profit, right? That's correct. How would we conclude that your clients had the objective of making a profit when they lost millions of dollars in horse racing over a 10-year period, $400,000 per year, at least, for 10 years, and the testimony was, at no time over those 10 years did they ever look at the books to see whether or not they were making or losing money. The testimony was that they looked at the purse money, the track winnings, but never in 10 years, despite those losses, looked at whether or not they were making money or not. How could that be? That's not accurate, Your Honor. Mr. Bucci, the record testified at trial that he did not look at the QuickBook electronic records. That was a mistake at the trial testimony level. In the record, there were, to be put into record of the business, or in the tax court trial, the general ledgers of that business, which recorded all the expenses.  He looked at the papers. Let me explain. It's not the accuracy of the records or the existence of the records. Where in the records, in any testimony, did your client ever examine them to see, am I making money or am I losing money? He looked at those religiously. In the record, he says, I looked at the papers. And the distinction was the error in the testimony. If you look at the testimony, he thought the judge was asking him about the QuickBook electronics files. He always looked at the paper records. That's why he was lamenting extensively with his various advisors that he'd hire and fire over the years. If he looked at the papers and saw he was losing a lot of money, what did he do to show that he was concerned about that? Did he hire a financial consultant? What did he do? He hired the best advisors and professional trainers in the industry. Trainers deal with the horses. These trainers, Eddie Keneally, Chad Brown, all of these individuals are experts in not just training horses, but advising on the finances of the industry. All of their work with him was, how do you pick the horse? How much should I pay for the horse? How much should I pay for the vet bills? What races, what primary races do we go in? This is no different from, let's say, an NFL football team where you're relying on your general manager, your coaches, et cetera. This racing activity that Mr. Bucci was involved in is the highest level. This is Kentucky Derby rated horses. His horse that died. But that doesn't mean it was for profit. You could have someone who for pride wants to try to get a horse into the Kentucky Derby because that would be a really cool thing to do. That doesn't mean just because that was the goal that that's a profit-driven goal. He generated $3 million over the course of the period of time here. Yeah, but he lost more. We're talking about profit. We're not talking about revenue. If you consistently make $3 million a year, you can't wave around that number and say it's a massive amount if you were losing $100 million a year, right? The question is profit, so revenue is not particularly interesting, right? The revenues, right, that's a negative in this case. But that's why there are several factors that have to be considered. But isn't that the biggest one? Any year. A profit objective and he never had profit. He's got to prove that he had a profit objective and he never had profit. He was close to getting horses to these primary races to rake in millions and millions of dollars. He's there. He had the prestige. He had the advisers. He had the resources from his business to do this. He was there. What's the standard of review here? The standard of review on the application of the law is de novo. And we would submit that the court applied the law incorrectly not only on the analysis because they looked at reasonableness. The court decided he had no profit motive based on the trial testimony, the information, documents, and the records and so forth. Is that a finding of fact or a conclusion of law? On the profit motive? Yeah. If the court applied the test to his profit motive rather than the reasonableness of his expectations, he would be applying the law to the facts of the case. No question, Judge. We would have to analyze that that way. But he said very clearly dreams are dreams, business is business. But the thing is the dream of winning the Kentucky Derby, just like the dream of a football team winning the Super Bowl, means millions and millions and millions of dollars. This man was at that pinnacle. He could have done that. Right, but if you're spending twice as much, again, the idea of winning the Super Bowl doesn't matter much. If you're spending twice as much as you would ever win if you win a Super Bowl, right, then the NFL owner is not operating with a profit motive. So that NFL owner would be in a hobby as opposed to the other owners. That's what I'm saying. That's what I'm saying. You're saying that shooting for a Super Bowl, that because there's so much money at stake, it's got to be a profit motive. And I'm saying, again, that just comes back to, yes, you may be aiming at winning something that's a lot of money. But if you're indiscriminately spending two, three, four times as much money, that belies the profit motive. But that's why the losses cannot be a factor. That's why they have all these other nine factors. They can't be a factor? It can't be the determinative factor. Well, nobody said it's the determinative factor, but it sounds like you're saying we should ignore them. No, it's a factor to consider. You're basically saying any time someone says, I'm hoping one of my horses gets to the Kentucky Derby because that would be a huge payday, they're doing it for profit. And that can't be. Exactly right. That's why the lion's share of these cases involve dentists and doctors who have family farms where they go, I hope this little pony gets to the Kentucky Derby. This man was buying these horses at the platforms that you buy Kentucky Derby winning horses. All right. We understand the argument. You have your two minutes for rebuttal. And Mr. Amend. May it please the court. Andrew Amen for the Commissioner of Internal Revenue. In Section 183 of the Internal Revenue Code, Congress expressly targeted the taking of asserted business deductions by individuals with substantial other income for large losses sustained in the breeding and racing of horses. Judge Friendly gave voice to the same essential policy concern in the Bessonnier case, where he warned of the government being put in the, quote, presumably undesired position of subsidizing activities in which wealthy persons engage primarily for pleasure, unquote. The present matter is a case in point. One point I would like to start with, just on the record, because I believe my friend has misrepresented what Mr. Bucci said about whether he considered his losses and the books and records reflecting those losses during the time that he was accumulating millions and millions of dollars in losses. He said, she did give me the papers. That's what he said about his bookkeeper. He didn't say that I looked at the papers. The court then went on and asked him, were you reviewing the QuickBooks every quarter or every month, every year? Answer, no, I did not. Okay, how do you keep track of whether you were making money or losing money on the business? Answer, no. Answer, well, the only thing I ever went by was the purse money I was taking in when I was winning. So there's no explanation. I had these, you know, hard copy papers that I was looking at to determine whether I was making money. I was only looking at the purse money. Then on, this is on, that was on page A1377. On page A1405, on cross-examination, Mr. Bucci was asked the losses for 2016, that $619,000 plus, and for 2017, $412,000 plus. He acknowledged that he had those losses for those tax years and then was asked, in light of that reported loss in 2016, you didn't review any of the books and records. Is that correct? Yes. In 2007, and then the next question, in light of the loss reported in 2017, you didn't review any of the books and records as well. Is that correct? Yes. So the idea that Mr. Bucci actually testified that he was looking at the books and records and was just looking at it in paper form is flatly refuted by the record. And your honors, I think, have hit on exactly the essential premise in this case, whether or not the tax court clearly erred when it looked at the record of losses, looked at Mr. Bucci's testimony about what he was, whether he was attending to the losses and what he was doing, if anything, to try to stem them. It looked at his professed dream of getting the Kentucky Derby, and it reached the conclusion, much as Judge Friendly did again in the Bessonnier case, that taxpayers undertook and continued this activity without much caring whether they made a profit or not, though naturally hoping that they might. And we also, as we've explained in our brief, their losses at this point are so large that even if he got a horse to the Kentucky Derby, it's far from clear that he would actually make his money back. There was a reference of one horse that made it to the Kentucky Derby and won and generated $5 or $6 million in profit. And he has already lost more than $6 million just on horse racing on the years that are in the record and another $2 million on farming, which if he wants to press his forfeited argument that the farming was part of the horse racing activity, that's another $2 million, again, for just those 10 years that he has to show that he's going to prove. Can you just spend a moment? We did deny the supplemental request for supplemental briefing, but can you address this recent decision that Mr. Andreozzi? Yes, yes. Well, I suppose we would point out that this tax court decision came out November 5th, and yet taxpayers did not attempt to raise this or any Loper-Bright or Chevron issue until last week. So we don't have – first point, I guess, would be that taxpayers never challenge these regulations as inconsistent with the statute. In any event, Loper-Bright's holding is that courts cannot defer to agency interpretations of statutes that differ from the court's own. But the regulations at issue here were derived from the case law. In fact, in the tax court order that was the basis for my friend's motion, the tax court said – the factors that are in them are derived from prior case law, so we would apply the same factors anyway. On top of that, under both regulations, the regulations themselves say that courts are to apply a totality of the facts and circumstances test. So it's hard to see what a court – how the tax court was giving binding deference when it was looking at a test that acknowledged – told it to consider all the facts and circumstances, not just those listed in the regulation. Finally, this case is almost a singularly poor vehicle for any kind of Loper-Bright challenge on appeal, because the tax court noted that the Seventh Circuit had said that courts – the tax court should apply a holistic facts and circumstances approach. And as an alternative holding, after going through all nine factors, it also held that under that holistic overall facts and circumstances approach, taxpayers had not shown a primary profit motive. So there would be no point in sending this case back, given that holding. And none of the court's holdings were clearly erroneous. Taxpayers also – they claimed that the judge was effectively required to adopt their position, that a focus on winning or a focus on getting to the Kentucky Derby meant that they had a primary profit motive. This record demonstrates that you can win – you can, as my friend said, generate $2.9 million worth of gross income and still have net losses that are twice that large. They spent $9 million to make that $3 million, and the rest they deducted, which had the effect of subsidizing their participation in the Sport of Kings. There's no question that they enjoyed it. The welter of factors here, in sum, went against the taxpayers, all nine factors. Even if, you know, this court might conclude that the tax court could have weighed some of the evidence differently on some of the factors, taxpayers are hard-pressed to make the case that the tax court committed their error. They also claim that the tax court required them to have a reasonable prospect of making a profit, a reasonable expectation of making a profit. We submit that it did not. The court said twice on – this is at SB 821 – first, that taxpayers were, quote, not in the horse business for profit, unquote. Also said, quote, This was after the court correctly laid out the governing test at the beginning of its discussion, where it said there has to be – although the expectation of profit need not be reasonable, there must be an objective of making profit. The court also effectively then proceeded to apply the maxim that if the chance for profit is small relative to the potential for gratification, the latter may emerge as the primary motivation. The court's findings under all of the regulatory factors, the overall facts and circumstances, were well supported that taxpayers had a potential for gratification, personal gratification, satisfaction, pride, excitement, et cetera, that was their primary motivation. All right, thank you, Mr. Amend. We'll hear Mr. Andreozzi's two-minute rebuttal. Thank you, Your Honor. To be clear, in the Schwarz case, there's a 116-page opinion where that taxpayer had a consistent, consistent history of losses in the case. Same as here. All of those circumstances were practically identical in the consideration. Different activities, ranching and farming versus horse racing and farming, but dramatically more losses than here. And the court said we need to reconsider these issues under Loper-Bright. To Mr. Amend's other point, if the court below were to have not looked at the losses, not known, if anyone would have not known of the losses in Mr. Bucci's racing business, they would have looked at it as a man who was dedicated to making a profit in the industry. Your adversary pointed us to a number of statements where your client is saying he didn't look at the records. How do you deal with that? That issue? Yeah. Here's what he did. Quite different from what you told us. He had three levels of review of his finances in that business. His personal assistant, who was keeping the books and records, his CPAs, and his advisors, who would advise him on the management of the business, how much to pay for a horse, how much not to pay for a horse. And he was listening to all of them in their advice on that. When he lowered his prices that he was going to pay for a horse, respondents said, why did he lower it? He should have been increasing it. When he increased, respondents would say, well, why did he increase? He's spending too much money on the endeavor. This is a man who worked to the bone in his salt mines, and he devoted time to this industry as well. He relied on those experts to look at and determine whether and to what extent he should be continuing with this business. He was not a numbers person. All right. All right. Thank you both. We appreciate the arguments, and we'll reserve decision. Have a good day. Thanks.